Shortly after 6 o'clock on the morning of February 25, 1943, Henry E. Crawford sustained serious personal injuries when the driver of the automobile in which he was riding went to sleep at the wheel and permitted it to swerve to the right, mount the curb of the sidewalk and crash into a tree. The automobile was ordinarily used as a taxicab, was owned by Thomas Bullock and was driven by Frank Glockner. In lieu of a public liability policy, Independent Cab Operators Association had deposited with the City of New Orleans a bond or securities in the sum of $20,000 as a guarantee that should liability result from the operation of that cab or of certain other designated cabs, the said liability if not discharged directly, would be paid out of the said fund. The cab was one of a group operating tinder the trade name "Checker Cabs." Walter Mumphrey was the owner of that trade name and was paid by the owner or operator of each Checker Cab a certain sum periodically for the right to use the name "Checker Cab."
Crawford brought this suit against Glockner, the operator of the cab, Bullock, the owner, Independent Cab Operators Association and Walter Mumphrey, alleging that he had paid a fare to Glockner for himself and the other occupants of the cab and that the accident was caused by the negligence of Glockner and that because of that negligence all of the said named defendants are liable to him.
The four named defendants by rule nisi called upon plaintiff to elect "as to whether he will proceed with his action under the contract of carriage or whether he will proceed with his action of tort." Plaintiff answered this rule by asserting that he "elected to sue on the contract of carriage."
The Board of Administrators of the Charity Hospital at New Orleans intervened, alleging its right to recover from the various defendants $121.50 with 10% attorney's fees for services rendered to the said Crawford because of the said injuries.
Glockner filed no answer but the other three defendants in effect admitted all of the essential allegations except that a fare had been paid or that at the time of the accident Crawford was riding as a passenger for hire. They averred that, on the contrary, an hour or so prior to the accident Glockner had "checked in" at the Checker Cab Company headquarters and had stated that he would carry no more passengers that night; that thereafter he had proceeded to a place known as the Magazine Grill where he had met the persons who later were in the cab when the accident occurred; that he, Glockner, and the other persons had agreed to go to the home of one of them to cook and cat some fish and that Glockner was riding the said persons as his guests and not as paying passengers; that whatever may have been the liability of Glockner, resulting from his negligence, there was no liability in any of the others. Defendants also contended that, even if any money was paid to Glockner, which they denied, it was not paid to him as a fare but was given to him as a gratuity to help him out in the expense of operating his cab on that particular trip, and they also maintained that they are not liable in any event because the cab was rented by its owner to Glockner at a fixed rate per day and that the said owner had no interest in its operation and received no share of the profits earned by it. In support of this last contention, defendants rely upon the doctrine announced in Atkins v. Points, 148 La. 958, 88 So. 231, in which our Supreme Court held that the owner of a cab who rents it out at a fixed sum per day is not liable for injuries caused by the negligence of the operator of the cab.
When the case came to trial it was noticed that although Glockner had filed no answer, no preliminary default had been entered against him and therefore counsel for plaintiff moved that a preliminary default be entered.
The case went to trial and there was judgment in favor of Crawford for $5,000 and against all of the defendants except Mumphrey. The suit as against him was *Page 435 
dismissed. Bullock and Independent Cab Operators Association appealed suspensively and Crawford has answered the appeal asking that the amount awarded him be increased to $9,000. Glockner has not appealed and the judgment against him has become final.
There are three issues involved. They are very similar and two depend upon questions of fact — the first, and principal issue is: Was Crawford riding as a passenger for hire or was he a guest of Glockner? The second is this: If he did pay $1 to Glockner as he contends, was this in payment of fare or was it purely a gratuity given to Glockner to help him out in the expense of operating his cab on that trip? The other issue, one of law, is whether an owner of a cab who rents it out at a fixed daily rate is liable for injuries caused by negligence of its operator?
The Magazine Grill is shown to be a bar-room near the main office of Toye Bros. Yellow Cab Company and it appears that it is a congregating place for taxicab drivers, and particularly for drivers of that company during their spare or off hours. It is described by some of the witnesses as a kind of club.
Crawford, Fonseca and Brown who occupied the cab with Glockner when it left the Magazine Grill, were all employees of Toye Bros. whereas Glockner, as has been said, operated a Checker Cab, though after the accident he was employed, by the Toye Bros. Yellow Cab Co. These four were friends prior to their meeting on that morning. Glockner says that after checking out at the office of his company he had taken a friend, Lacoste, to his destination and had taken two other friends to the Magazine Grill, and had not charged any of them fares for those trips; that at the Magazine Grill, Crawford spoke to him about riding home and that he agreed to take him but did not want any fare; that then Crawford "shoved this dollar bill in my pocket" and a discussion concerning fish took place.
Brown told Glockner and the others that there were some fish at his home and defendants maintain that he also suggested that they all go to his home and have a fish fry. Plaintiff asserts that though Brown did say that there were fish at his home, he did not suggest a fish fry but merely said that if, on the way to their respective homes, they would pass by his house, he would give each of them a fish. Without finding it necessary to go into a detailed discussion of the evidence, we conclude that the evidence overwhelmingly shows that it was planned to have a fish fry at Brown's house and that Glockner was invited to take part. It is shown that some one brought along some bottled beer, although that fact is important only in that it indicates that a party of some kind was planned.
When they reached Brown's house they found his wife ill and he told them that he could not entertain them there. Crawford contends that they did not intend having any kind of a party and that Brown went inside and came out with three separately wrapped fish and gave one to Crawford, one to Glockner and one to Fonseca. Here again we conclude that the evidence by an overwhelming preponderance shows that all four of them went into the Brown house for ten or fifteen minutes and that when they left Brown, instead of giving them three separately wrapped fish, gave them only one package containing all of the fish. If they all went into the house at that time in the very early morning, it is very suggestive of the fact that it was intended that they have a party there and if, when they found that they could not stay there, he gave them one package containing all the fish, this is also suggestive of the fact that they intended to go to the house of one of the others to have the party when they found that Brown's wife was sick.
After leaving Brown's house, and before reaching Crawford's home, the accident took place.
All of the witnesses stated that when taxicab drivers ride one another they are not in the habit of paying fares though sometimes they "chip in" to help pay for the gasoline. Two important facts are thus developed, both of which have a tendency to indicate that it would not have been remarkable for Glockner to have been driving his friends without making a charge — first, the custom between chauffeurs that even under ordinary circumstances no such charge is made, and second, the fact that these four were all going on a party together.
Though numerically the witnesses who said that the dollar was paid greatly preponderate, there are in the statements of those witnesses such strange inconsistencies and *Page 436 
contradictions, and in others such a parrot like repetition that we find ourselves unable to believe them.
In the first place, though Glockner says that he did not want to accept the dollar and that against his wishes Crawford thrust it into his pocket, Fonseca says that Crawford and Glockner discussed the fare and that Crawford offered a dollar which Glockner accepted. Crawford himself says that Glockner knew that he had asked Fonseca to telephone for a Yellow Cab and that Glockner had said to him: "You are going to pay the other driver a dollar. Give me the dollar and I will take you home." When asked how Glockner knew that he was going to give the other driver a dollar, Crawford said: "He knew that he was going to give the Yellow a dollar to bring me home because I live way back," and yet the record abundantly shows that Glockner did not have the slightest idea where Crawford lived for although Crawford gave him his address when the trip started, he found it necessary, after leaving Brown's house, to again stop the cab to ask Crawford where he lived.
The witness Scbussler was present in the bar-room and he says that he saw Crawford hand Glockner a dollar; that he knew it was a cab fare because Crawford "was fixing to leave." He admits that he heard nothing said but he states that "I was just looking out of curiosity how much he was paying for the service" and yet he says that he did not have the slightest idea who were going to ride nor where they were going. He had a vivid, perfect recollection of having seen the dollar pass yet he made no mention whatever of it until just before the trial — almost one year later.
Dragon, another witness for plaintiff, who by chance walked into the bar just as the dollar bill was being handed by Crawford to Glockner, saw nothing else and heard nothing else. He says that he attached no importance to seeing one person hand another a dollar but he remembered it perfectly. When questioned as to why he remembered that incident so well and yet knew nothing else, he said, "I ain't got a thousand eyes." He, too, failed to say anything about this until much later and couldn't say when he had first mentioned it to plaintiff.
The witness Fonseca was summoned by both parties and he was placed on the stand as a witness by the plaintiff. He had given a written statement to the defendants and we gather from the controversy concerning the admissibility of this statement that it contained nothing to show that he had seen Crawford hand the dollar to Glockner. After testifying on behalf of plaintiff that he had seen Crawford pay Glockner the dollar, he was cross-examined by counsel for defendants who suggested their desire to impeach his testimony by producing the written statement which he had given to them. At that stage of the proceedings the district judge stated to counsel for defendants: "You cannot impeach him; you have him on cross examination. You summoned him and didn't put him on."
If in order to reach a conclusion in this matter we had found it necessary to investigate the statement which Fonseca gave to counsel for defendants, we would remand the matter as we have more than grave doubt as to the correctness of this ruling. But the evidence so overwhelmingly convinces us that no such payment was made that we find it unnecessary to send the case back for the introduction of that statement. The record leaves us with a firm conviction that the Yellow Cab drivers and plaintiff's witnesses, who are almost entirely recruited from the ranks of that corporation, were determined from the first to do all that they could to harm the rival cab operators. This attitude was very evident in their testimony.
The other cab company had no concern whatever with the outcome of this suit, and yet we find its adjuster taking full charge of the taking of statements and, obviously, giving to those witnesses who were in its employ the impression that their employer was anxious to see Crawford succeed. It may well be that this was not his intention and that he was merely acting as a friend to one of the employees of the company by which he, himself, was employed, but it is quite clear that many of those witnesses had the impression that it was their duty to help Crawford as much as possible.
Glockner's testimony and his attitude reflected by it indicate that he well knew that though he was the person whose fault was solely responsible for the accident, no real attempt would be made to hold him liable. Though not an employee of the Yellow Cab Company at the time, he was employed later by that company. He stated that since he had been responsible for Crawford's injuries, it was his duty to help him out all he could. *Page 437 
Fonseca, an employee of the Yellow Cab Company, was obviously so very prejudiced in favor of Crawford that when he was asked why he felt it his duty to give a statement to the Yellow Cab Company's adjuster, the district judge himself took over the examination, and in answer to the judge's question as to whether he felt that it was his duty, Fonseca said: "Yes, sir, to hold my job, yes, sir." He had no job with Crawford and it is evident that he thought that his employer was so interested that his employment might depend on his testimony.
Just what is required in any case to produce conviction of where the truth lies is not to be determined by a counting of the witnesses nor by the ability to point to any one statement. Very often if a statement is made by one witness, it might carry conviction whereas when the same thing is said by two or three or more, a shadow of suspicion falls on the testimony of all. Particularly is this true where many witnesses, with uncanny accuracy, remember the details of a statement or an act which when said or when done was of no importance or significance. Here was a barroom which, according to all, was well filled with drinking men. There was certainly nothing unusual about the handing by one of a dollar bill to another yet all of the witnesses produced by plaintiff remember in detail that this transaction took place and, although most of them heard nothing said, all knew that the dollar was given in payment of a fare not for a ride already had but, unusual enough, given in advance for a ride to be taken later. We could point to many other facts which cast grave suspicion upon the evidence submitted by plaintiff.
The record is a very large one and we have taken the written statements of all of the witnesses and carefully checked them, one against the other, and as a result, we have demonstrated, at least to ourselves, with mathematical certainty that the case of plaintiff is based on a false premise; that no dollar was paid by him to Glockner and that he was riding in the cab as the guest of Glockner and not as a passenger for hire. The necessary result is that the case must fall against all of the defendants except Glockner. The other contentions of appellants need not be considered.
It is therefore ordered, adjudged and decreed that the judgment appealed from in so far as it runs against Thomas Bullock and Independent Cab Operators Association be and it is annulled, avoided and reversed, and that there now be judgment in favor of Thomas Bullock and Independent Cab Operators Association, dismissing plaintiff's suit as against them. Plaintiff to pay all costs.
Judgment reversed.